[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The parties to this sixteen-year marriage were mated in Chicago, Illinois on October 5, 1985. There are three children of the marriage: a daughter Jordan, born January 2, 1990, a sixth grade student at Greenwich Academy; a son Collin, born February 8, 1993; and a son Wyatt, born April 11, 1996. All three children live with the plaintiff wife ("wife") in the marital home located on 14 Broad Road in the Belle Haven section of Greenwich, Connecticut. The defendant husband ("husband") also lives in another part of the family home. The parties stated for the record that they had worked out a parenting plan with Dr. Jerome F. Brodlie dated August 8, 2001, and asked that it be approved and incorporated in the court decree in accordance with a stipulation as on file with the court.(#202)
The wife is 42 years old and a graduate of Vassar College with a B.A. in economics. Following graduation she went to work for Marine Midland Bank as a lending trainee for approximately one year, at which time she joined the San Francisco Morgan Stanley Office where she worked from CT Page 418 September 1982 to December 1984 in the area of municipal bonds. She later transferred to the Chicago Office of Morgan Stanley where she met the husband in May of 1984. They lived together for a short while after which they were married. Sometime after they were married, she left Morgan Stanley, according to her testimony, because it was difficult to work in the same office with her husband, and she wanted to take time off to set up a home. Other than working in an art gallery for approximately a year between 1987 and 1988 for which she was paid no salary or wages (although she did receive an occasional piece of art), she has had no work outside the home since she left Morgan Stanley. She has the day to day responsibility for the three children, however, she does have ample assistance with two housekeepers and a nanny. The oldest child, Jordan, has dyslexia. The two younger children have had a host of serious medical problems since birth and, according to the wife, require some special attention on her part. The wife has remained active and fit through her interest in rock climbing. She works out regularly and has a coach with whom she has traveled to various places in order to climb. She testified that she will probably reenter the work force sometime in the future, but that she will not make any plans until she sees the outcome of the present action.
The husband is 47 years of age and has a Bachelor's Degree as well as an MBA from the University of Chicago. He had a number of responsible positions with Morgan Stanley over the span of a twenty plus-year career with them and for which he was quite well compensated. For the years 1995-1999 his W-2 income ranged from a low of $660,000 to a high of $7,335,000. Much of his assets were reflected in Morgan Stanley stock and options, deferred income and retirement vehicles. At the time the wife filed the complaint in this action, the husband had amassed assets through Morgan Stanley of approximately $25,000,000 in value. Approximately half of this was Morgan Stanley stock which has been long since liquidated. On June 28, 1998, and prior to the time that this action was commenced, the husband quit his job to spend more time with the children, with the belief that the income from his assets would be sufficient to carry the family. This was corroborated by more than one witness. After a period of unemployment, the husband obtained an interim position which he later resigned, and is currently Managing Director at Spencer Trask for which he receives a base annual salary of $250,000. In addition, he has a bonus/commission arrangement with an override on sales. His job focus is on sales to institutions.
Basic housing expenses for Greenwich run approximately $34,000 per month. The balance of the other expenses when added to the housing expense amounts to $84,000 per month.
At the time of their marriage, the husband had been working at Morgan CT Page 419 Stanley for approximately eight years. He had at that time a brownstone and an apartment on Lake Shore Drive and according to his testimony additional assets in excess of $1,000,000. However, no evidence of fair market value at that time was offered other than his typed statement offered as Defendant's Exhibit C. The wife indicated that she had brought to the marriage approximately $30,000 in assets, including an IRA, home furnishings, a checking account, and her car. She also testified that her highest salary ever at Morgan Stanley was in 1985 when she earned $60,000.
Evidence varies as to the fair market value of the family home at 14 Broad Road in Greenwich. According to the testimony of the wife's appraiser, the property is worth $4,700,000; according to the husband's appraiser, it is worth $5,500,000. The court finds the value to be $4,900,000. The home has a $3,050,000 first mortgage balance as well as a home equity line of credit with a balance in the amount of $100,000. The disposition of the Morgan Stanley stock to pay for living expenses for over a year following his resignation, has left the family with very few liquid assets. At one point, when timing was crucial, whether from spite or pique, the wife refused to cooperate with the husband in the disposition of certain Morgan Stanley assets, thus losing the opportunity and more important, significant value. Aside from the house, the principal marital assets are the husband's interest in retirement funds and deferred compensation of approximately $2,250,000. According to the husband's testimony, the plan denominated OSEP-1, which would provide the parties with income at the husband's option at age either 55 or 65, was fully funded with premarital assets at the time of the marriage. He assigns a value of $864,000 to this asset which is more than a third of the retirement funds. In addition the husband has a one third interest in a ski house in Deer Valley, Colorado, which was acquired prior to marriage, having a value of $185,000 but carrying with it his share of the financing amounting to $433,000. All told the liabilities (excluding the mortgage and home equity) including actual and estimated taxes for years 2000 and 2001 amount to more than $1.7 million.
Following the close of evidence on August 15, 2001, the joint property in Jackson, Wyoming was sold on September 21, and the net proceeds amounting to over $1,800,000 were placed in escrow in an interest bearing account by agreement. Subsequently, on October 11, 2001, the parties entered into a Stipulation (#217) which was filed with and approved by the court. This provided, inter alia, for the payment of certain outstanding tax obligations from the escrow, as well as the wife's monthly allowance, and, in addition, each party took an advance against their ultimate equitable distribution — the wife $175,000 and the husband $125,000. The agreement left to the discretion of the court the ultimate allocation of responsibility for some of these payments and CT Page 420 advances.
The court has heard lengthy and at times emotional testimony regarding the breakup of the marriage. The wife alleges that from very early on in the marriage, the husband complained of a number of medical problems which he treated, according to her description, with "two baskets full" of prescription medications. He lost some time at work through his various complaints. She described her husband as "emotionally absent" and said that she felt "like a single parent." Moreover, she testified that he was "completely absorbed with anything but her and the children." The husband indicated that he had sinus problems which necessitated an operation, and also suffers from acid reflux disease, and that is the only medication that he is taking at the moment. The wife also testified that from very early on in the marriage the husband was a regular user of cocaine and marijuana. The husband denies this, however, the wife corroborated his cocaine use on several occasions through the testimony of two of her sisters. This calls his credibility into question. Each accuses the other of infidelity. The husband claims that the wife had an affair with an old friend early on in the marriage which affair continued for a lengthy period of time. The wife was very circumspect about this and denied any long term involvement. She did admit that "one or two times" were spent with this male friend from her college days. The husband also has accused the wife of traveling with her rock climbing coach, clearly implying a close personal relationship. She denied any sexual involvement at first, however, she did admit she and the coach traveled to Jackson, Wyoming to climb in the Grand Tetons, and that they had spent the time at the family's vacation home in Jackson. According to her testimony, they did not become "romantically involved" until October 1999. The court finds the wife to have been less than candid on this subject, and that she has taken a calculated risk that what the husband can't prove, she will either deny or not admit. This undermines her credibility. For his part, the husband has admitted to two long term romantic relationships. He is currently seeing one E. D. Dunahey, with whom he and their respective children have taken several trips. Mrs. Hill has alleged that the erosion of their assets is in large measure due to lavishness with which the husband continues to spend on luxuries, including travel, while she herself sought no diminution in the monthly stipend. The husband has indicated that he and his current significant other share expenses more or less equally and reimburse each other as the case may be depending upon who has advanced the funds.
The plain fact of the matter is that neither party wishes to change their basic lifestyle one iota. Both are intelligent people, and the court can't help but conclude that they know perfectly well that, although they may not have spent themselves into the proverbial "poorhouse," they have been swept along on the riptide of the husband's CT Page 421 spectacular success and have swapped much of their future security and comfort (and that of their children's) for the sake of immediate gratification. They have partaken of the feast, and now, with appetites wetted, appear determined, like the ancient Roman revelers, to disgorge and return to the table. The downward spiral of the economy, as well as the failure of either party to retrench in the face of the change in the husband's income, has resulted in a serious erosion of the income producing assets available to the parties for their current living expenses. Both have continued to spend as if the husband's resignation from Morgan Stanley never happened. To say that their lifestyle was and is lavish would be an understatement. The parties are used to world travel, expensive meals, limousines, and chartered airplanes. Each party appears to be caught up in their own little world. As an example, the husband took the children for a six-night vacation to Paris and London that cost about $100,000. They are both, in short, self-centered and self-indulgent in the extreme. Sadly, for their three children, who obviously need them even more now that the marriage has come unraveled, both parents hold to the false notion that they will somehow fail their children if they do not provide them with every possible form of luxury and entertainment. The reality is that children, whether those of privilege or poverty, simply crave the unvarnished time and attention that only a parent can give. The "bread and circuses" are totally unnecessary to their development as well-balanced, well-mannered, responsible members of society.
 FINDINGS
The Court, having heard the testimony of both parties, and having considered the evidence presented at hearing, as well as the factors enumerated in Sections 46b-56, 46b-81, 46b-82, 46b-84, and 46b-215a of the Connecticut General Statutes, including the Child Support and Arrearage Guidelines Regulations, hereby makes the following findings:
1. That it has jurisdiction.
 2. That the allegations of the complaint are proven and true.
 3. That the marriage of the parties has broken down irretrievably, and that ample evidence exists that both parties have contributed to said breakdown.
 4. That the court is aware of the Memorandum of Decision of Judge Harrigan dated June 11, 2001, and the findings and conclusions therein regarding temporary alimony and child support, as well as the CT Page 422 earning capacity of the husband; that the purpose of pendente lite orders is different from that of permanent orders Wolk v. Wolk, 191 Conn. 328, 330-331 (1983); and that the court may enter such permanent orders as it deems fair and equitable and is not bound by the pendente lite orders.
 5. That the husband voluntarily left his previous employer on June 28, 1998, which decision resulted in a substantial reduction in family income; that the husband's motivation for leaving his job was to spend more time with his children, which decision the court believes to have been sincere based upon the testimony of the husband and that of other witnesses; that he made some effort to find alternate sources of income; that he has since become employed full time at a base salary of $250,000 per annum which the court finds to be a fair measure of his present earning capacity under all the circumstances, including the economic dislocation in the securities industry resulting from the events of September 11, 2001.
 6. That the wife has a demonstrated earning capacity of at least $50,000 based upon her previous work experience, health, and education; that at the present time she has sufficient domestic assistance in order to work outside the home; and that while it may not be appropriate for to work full time outside of the home at this time due to the special needs of her two younger children, it is equitable and appropriate that the court take her earning capacity into account in some measure fashioning its financial orders.
 7. That the younger two children have had serious health complications following their birth and have special needs which require more attention than would normally be the case.
 8. That during the period of the husband's unemployment and/or underemployment a substantial portion of the marital assets were used by the husband to pay the ordinary and customary family bills and expenses, as well as to sustain what can only be described as the lavish lifestyle of both CT Page 423 parties; that the evidence supports the fact that neither party made a serious effort to cut back expenses or otherwise retrench; that those expenditures made from the sale or other disposition of assets has resulted in a substantial erosion of the marital estate; that, in addition, in 1999 while the present action was pending, the wife wilfully and without good cause refused to cooperate with the husband in the negotiation of certain Morgan Stanley stock and options when timing was a critical factor, thereby resulting in another substantial loss of value of the marital assets amounting to $1.7 million of stock and 10,000 options; and that it is equitable and appropriate for the court to take the actions of both parties into account in the division of the remaining marital assets.
 9. That according to the testimony of the husband he brought to the marriage assets having a value in excess of $1,000,000; that these assets include, inter alia, cash, retirement assets, antiques, and real estate; that minimal corroborating testimony as to fair market value at that time was offered, the list of assets themselves was unchallenged, and the court takes notice that the total value would be substantial; and that it is equitable and appropriate that the court take this into account in the division of assets.
 10. That the wife brought to the marriage assets having a value of approximately $30,000; that these assets include, inter alia, an Audi, a retirement fund, some furnishings, and a checking account; and that it is equitable and appropriate that the court take this into account in the division of assets.
 11. That each party has contributed in some measure to the acquisition, maintenance, and preservation of the marital assets during the course of the marriage; that the acquisition thereof was due in large measure to the acumen and efforts of the husband; that the wife has contributed to the marriage largely as homemaker and mother of three minor children; that however these contributions CT Page 424 have been somewhat offset by the actions each party, in that each has contributed in some degree to the wastage of significant portion of their accumulated wealth, in particular during the pendency of this action.
 12. That prior to and during the marriage, the husband participated in and acquired a vested interest in a number of retirement funds as well as deferred compensation; that these assets are, in whole or in part, marital assets subject to equitable division, as follows:
 A. That the plan known as OSEP-1 was fully funded prior to marriage; that at the time of the marriage the value was $160,000; that it has appreciated in value during the marriage and has a current value of $864,316; and that it is equitable and appropriate that the wife share equally in the appreciation in value since the date of the marriage.
 B. That the husband is vested in a certain pension with his former employer, Morgan Stanley Dean Witter; that he was employed there for eight years prior to the marriage; that the pension is a marital asset subject to equitable distribution; and that it is equitable and appropriate that the wife share equally in two thirds of the vested interest as of the date of this memorandum of Decision.
 C. That the following retirement assets of the husband as shown on his financial affidavit, including IRA-1, PTIP 1, PTIP 2 3, OSEP 2 Pre-tax, IRA-2 (Xantopics), and IRA-2 (Corona), are marital assets; and that it is equitable and appropriate that the wife share equally therein.
 D. That the husband's 401(k) Plan at Spencer Trask was acquired after the commencement of the present action; that the wife's contribution to the acquisition and preservation of same was de minimus; and that it is equitable and appropriate that the husband retain same free and clear of any claims by the wife.
CT Page 425
 E. That the wife had an IRA in place at the time of the marriage; that the husband's contribution to the acquisition and preservation of same was de minimus; and that it is equitable and appropriate that the wife retain her IRA as shown on her financial affidavit free and clear of any claims by the husband.
 13. That the jointly-owned real property at 14 Broad Road, Greenwich, Connecticut, was acquired during the marriage and is marital property; that the fair market value thereof is $4,900,000; that there is at present a mortgage on the property having a balance of $3,050,000; that there is a current balance on the line of credit in the amount of $100,000, leaving an equity of $1,750,000; and that it is equitable and appropriate that the parties share therein.
 14. That on September 21, 2001, subsequent to the close of evidence herein, the jointly owned real property in Jackson, Wyoming, was sold and the net proceeds placed in an interest-bearing escrow account by agreement; that on October 11, 2001, the parties entered into a Stipulation as on file with this court (#217), which agreement provided for the payment of certain obligations, the continued payment of the monthly allowance to the wife, a partial distribution of assets to each party ($175,000 to the wife and $125,000 to the husband), and a reservation to the court to determine the ultimate financial responsibility for the payment for said obligations; that it is equitable and appropriate that the state and federal tax obligations (including interest and penalties), the mortgage arrears, and the wife's auto lease arrears be paid from the joint escrow without apportionment; that there should be an adjustment in favor of the wife from the husband's share in the amount of 60% of the fees of Mark Harrison and of the wife's monthly allowance (including any arrears as of October 11, 2001) through the effective date of this Memorandum paid from the escrow.
CT Page 426
 15. That the parties have agreed to a certain Parenting Plan dated August 8, 2001, which was arrived at with the assistance of Dr. Jerome F. Brodlie; that said plan is in the best interest of the minor children; and that it should be approved and incorporated in the decree by reference.
 16. That during the course of the marriage the wife accumulated a substantial jewelry collection by purchase and by gifts from her husband; that the testimony of the wife as to value was less than credible; that the testimony of the parties supports a value of same in excess of $158,000.
 17. That the presumptive basic child support is $684.00 per week; and that the husband's share is $684.00. However, the Court finds that it is appropriate and equitable to apply the deviation criteria set forth in §§ 46b-215a-3 (b) of the Child Support and Arrearage Guidelines Regulations, subsections (5) and (6), on the basis of the coordination of total family support and shared custody.
 18. That during the course of the marriage, the husband made investments in various entities with marital funds; that the aggregate gross value of same (prior to any deduction for debt associated therewith) is in excess of $700,000; that some of said investments may be either illiquid, encumbered, or otherwise impractical or disadvantageous to divide or dispose of same at this time; and that it is equitable and appropriate that the parties share equally in the risks and rewards therewith.
 19. That the legal fees and costs of Mark Henderson, Esq. as attorney for the minor children, in the amount of $9,152.50, all as set forth in detail in an Affidavit of Fees as on file (#204), are fair and reasonable; and that said fees should be paid equally by the parties from the net proceeds from the sale of the Wyoming real estate prior to any further distributions to the parties.
 20. That both parties have requested the court enter CT Page 427 an unallocated alimony order; that the court has declined to do so; and that the court in the exercise of its equitable powers has entered appropriate financial orders under all the circumstances. Porter v. Porter, 61 Conn. App. 791, 797-98 (2001).
 ORDER
IT IS HEREBY ORDERED THAT:
 1. The marriage of the parties is hereby dissolved, and they are each hereby declared to be single and unmarried.
 2. The parents shall have joint legal and physical custody of the minor children in accordance with a Parenting Plan dated August 8, 2001, as on file with the court and attached hereto as Exhibit A.
 3. Commencing January 1, 2002, and monthly thereafter, the husband shall pay to the wife the sum of $6,000.00 as and for periodic alimony, until the death of either party, the remarriage of the wife, or December 31, 2011, whichever shall sooner occur. In addition, commencing January 1, 2002, for so long as he has an outstanding alimony obligation to the wife, within two (2) weeks after receipt by the husband of any additional cash compensation from his employment (including but not limited to any bonus, commission, or commission override), the husband shall pay to the wife 30% of such gross additional cash compensation in excess of $250,000 per year up to and including $750,000, and 15% of the next $1,000,000 of such gross additional cash compensation in any calendar year, as and for periodic unallocated alimony and support, until the death of either party, the remarriage of the wife, or December 31, 2011, whichever shall sooner occur. Meaning and intending by this order that future alimony shall be based upon the first $1,750,000 of the husband's cash compensation from employment, and that all earnings in excess thereof shall not be subject to alimony.
 The wife shall have the right to earn up to CT Page 428 $50,000 gross cash compensation from employment per annum before the husband shall have the right to seek a modification of alimony on that basis alone.
 4. Commencing January 1, 2002, and monthly thereafter, the husband shall pay to the wife the sum of $2,000 as and for child support, until such time as the oldest child shall reach the age of eighteen years, at which time child support for the remaining children shall be adjusted in accordance with the then existing Child Support Guidelines or as a Court may otherwise direct, and in like manner at such time as the next oldest child shall reach the age of eighteen years. The foregoing notwithstanding, if any child shall turn eighteen years old and is still in high school, then, in that event, the child support shall continue until the first day of next month following graduation from high school or their nineteenth birthday, whichever shall sooner occur, pursuant to Section 46b-84 (b) C.G.S.
 In addition to the sums set forth above, as and for additional child support, the husband shall contribute to the private school education of each of the minor children up to and including high school, an amount not to exceed $15,000 per year per child. Any sums in excess of this amount shall be divided by the parties 25% to the husband and 75% to the wife. Furthermore, the husband shall contribute to summer camp for each of the children up to and including the summer prior to their senior year of high school in an amount not to exceed $2,500 per year per child, and any sums in excess of this amount shall be divided by the 25% to the husband and 75% to the wife.
 5. The wife shall have exclusive possession of the jointly owned real estate located at 14 Broad Road, Greenwich, Connecticut, subject to any existing indebtedness. The payment of the first mortgage, real estate taxes, and hazard insurance, shall be made from the escrow funds as set forth below. The husband shall vacate said premises no later than February 1, 2002, or at such other time as the parties may agree. As to said real estate, CT Page 429 the parties shall list same for sale no later than February 15, 2002, with a mutually acceptable broker who is a member of the Multiple Listing Service or other similar organization, familiar with real estate values in the Greenwich area, at an agreed upon asking price. If the parties are unable to agree upon a broker, each shall choose a broker who, in turn shall pick third broker, and the listing price shall be the average of all three brokers. Unless the parties shall otherwise agree, they shall accept any bona fide offer without unusual conditions, which is within 4% of the listing price. Upon sale of the property, from the proceeds shall be paid the customary and ordinary costs associated with a sale of real estate, including broker and attorney fees, conveyance taxes, and any mortgages and liens. After the payment of these sums, the net proceeds shall be divided 40% to the husband and 60% to the wife.
 While she occupies same, the wife shall have the sole responsibility for the payment of repairs costing $250 or less. Both parties shall share the cost of any maintenance, repairs, or replacements in excess of $250 in the same proportion as their share of the net proceeds. Either party may advance the full cost of same and an adjustment shall be made at time of sale or transfer. Neither party shall further encumber the property or draw on any home equity without the agreement of the other.
 The sum of $500,000 from the sale of the Wyoming real estate shall continue to be held in escrow. From and after January 1, 2002, until the close of title to said property, there shall be paid from said fund the following expenses: the first mortgage, real estate taxes, and hazard insurance premiums. Following the close of title, the remaining balance in the fund, if any, shall be divided by the parties, 40% to the husband and 60% to the wife.
 To the extent permitted by law, it is the order of this court that the wife shall have the benefit of the mortgage and real estate tax deductions until such time as the house is sold, the husband already CT Page 430 having the benefit of a substantial alimony deduction.
 The Court shall retain jurisdiction with regard to any conflicts arising out of this issue.
 6. The net proceeds from the sale of the Jackson, Wyoming real property, including any interest thereon, shall first be used to pay the balance due and owing to Attorney Mark Henderson in the amount of $9,152.50 within two (2) weeks hereof; from the balance, the sum of $500,000 shall remain in escrow pending the sale of the marital home in Greenwich to be used for the payment of the first mortgage, real estate taxes, and hazard insurance as set forth elsewhere in this order; the remaining balance shall be divided 40% to the husband and 60% to the wife. The foregoing notwithstanding, from the husband's share prior to any payment to him, shall be paid to the wife a sum equal to 60% of the fees incurred by her for the services of Mark Harrison and paid from the escrow funds, together with a further sum equal to 60% of the monies advanced to her from the escrow to satisfy the husband's outstanding and future pendente lite obligation through the effective date of this Memorandum of Decision, both pursuant to the Stipulation dated October 11, 2001.
7. Personal property shall be divided as follows:
 A. The children's furniture shall remain in the wife's residence.
 B. The home furnishings (other than the children's furniture and any specific items assigned elsewhere in this order), including fine arts, shall be divided as nearly equally as possible. In the event that the parties are unable to agree upon a division, the issue is hereby referred to Family Relations for resolution and recommendation.
 C. Each party shall be entitled to keep the automobile which they are currently driving (whether owned or rented) free and clear of any CT Page 431 claims by the other, and each party shall cooperate with the other regarding the execution of any documentation necessary to transfer and/or register same. Specifically the husband shall be entitled to the 1987 Porsche Targa and the Jeep Cherokee, and the wife shall be entitled to the Chevrolet Suburban, in addition to her leased vehicle.
 D. The remaining personal property shall be divided as follows:
 (1) The wife shall be entitled to retain her personal effects, including her jewelry, and in addition thereto, from the Wyoming home two brown leather club chairs, Chilean spurs, and the treadmill and other exercise equipment, free and clear from any claims by the husband.
 (2) The husband shall transfer to the wife within sixty (60) days from the date hereof fifty (50%) percent of his interest in and to the following: APH LLC, Atrevido LLC, Capital Accumulation Accounts (1988-98), MS VC Fund, MS RE Fund, MSEMELP Fund, Commercialware, Sigaba, Freesamples, AGI (AEI), and JEDEI. In the event that any or all of the above have restrictions which do not permit the transfer of any interest therein, the husband shall pay to the wife a sum equal to the value of her share as of the date hereof (or as close thereto as may be practicable). Any fees associated with the transfers shall be borne by the husband. Any income capital gains taxes associated with the future sale of their respective shares shall be borne by that party.
 (3) Except as otherwise set forth herein, each party shall be entitled to keep their respective savings, checking, and money market account balances free and clear of any claims by the other party.
 (4) Except as otherwise set forth herein, the CT Page 432 parties shall equally divide the stocks and bonds, whether in sole or joint names, and each shall cooperate with the other so that any transfers shall be complete within thirty (30) days hereof.
 (5) The husband shall be entitled to retain the cash value of any life insurance policies free and clear of any claims by the wife, subject however to the other provisions of this decree.
 (6) The husband shall be entitled to keep the Perlsco bank accounts free and clear of any claims by the wife.
 (7) To the extent that the following property which he brought to the marriage is still in existence, the husband shall be entitled to same free and clear of any claims by the wife: antique dining room set, french antique bed, Yamaha baby grand piano, and the French armoire.
 (8) The husband shall be entitled to retain his interest in the Deer Valley (Utah) condominium subject to the existing indebtedness, together with his "Various Partnership Interests" which he owned prior to the marriage and shown on Defendant's Exhibit C, (with the exception of any entities specifically referred to in 7. D. (2) herein) free and clear of any claims by the wife.
 (9) The wife shall be entitled to the Belle Haven Club membership, and the husband shall be entitled to retain the Camegie Club, LaSalle Club, Chicago Athletic Club, Saddle Cycle Club, and the Stanwich Club memberships. Furthermore, each party shall cooperate with the other, including the timely execution of any required resignation. The foregoing notwithstanding, if the by laws of the Stanwich Club so permit, at the request of the wife, the husband shall sponsor her and pay any necessary fees to establish a separate CT Page 433 membership.
8. The retirement assets shall be divided as follows:
 A. OSEP 1: Effective as of the date of this Memorandum of Decision, the then balance of the Morgan Stanley OSEP 1 Plan ("Plan") of the husband through his former employer, together with any interest and/or additions accrued thereon as of the actual date of distribution, shall be divided by means of a Qualified Domestic Relations Order ("QDRO") which shall be prepared by the husband's attorney, 67% to the husband and 33% to the wife. The wife and her attorney shall be entitled to any and all information regarding the Plan necessary to review the QDRO, including, but not limited to prior and current balances and prior account activity. No withdrawals, distributions, or transfers shall be made regarding the Plan except as consistent with this order. The Court shall retain jurisdiction to deal with any issues which may arise with regard to the preparation and filing of the QDRO and the division of the Plan. Any attorney fees and costs incurred in the preparation and filing of the QDRO's shall be borne solely by the husband.
 B. Morgan Stanley Dean Witter Pension Plan: Effective as of the date of this Memorandum of Decision, that portion of the Morgan Stanley Dean Witter Pension Plan ("Plan") of the husband through his former employer and vested and accrued as of the date of this Memorandum of Decision, shall be divided by means of a Qualified Domestic Relations Order ("QDRO") which shall be prepared by the attorney for the husband, 67% to the husband and 33% to the wife. Unless the parties shall otherwise agree, the husband shall elect a joint and survivor annuity, and in the event that the husband shall predecease the wife prior to drawing his pension, the wife shall be entitled to 100% of that portion of the survivor benefit vested and accrued as of the date of this Memorandum of Decision. Any benefit vesting and accruing CT Page 434 thereafter shall belong to the husband. The wife and her attorney shall be entitled to any and all information regarding the Plan necessary to review the QDRO. The Court shall retain jurisdiction to deal with any issues which may arise with regard to the preparation and filing of the QDRO and the division of the Plan. Any attorney fees and costs incurred in the preparation and filing of the QDRO's shall be borne solely by the husband.
 C. Miscellaneous Retirement/Deferred Income Plans: Effective as of the date of this Memorandum of Decision, the then balance of each of the following: IRA-1, PTIP 1, PTIP 2 3, OSEP 2, IRA-2 (Xantopics), and IRA-2 (Corona) ("Plans") of the husband individually or through his present or former employers, together with any interest and/or additions accrued thereon as of the actual date of distribution, shall be divided by means of separate Qualified Domestic Relations Orders ("QDRO") which shall be prepared by the husband's attorney, 50% to the husband and 50% to the wife. The wife and her attorney shall be entitled to any and all information regarding the Plans necessary to review the QDRO, including, but not limited to prior and current balances and prior account activity. No withdrawals, distributions, or transfers shall be made regarding the Plan except as consistent with this order. The Court shall retain jurisdiction to deal with any issues which may arise with regard to the preparation and filing of the QDRO and the division of the Plans. Any attorney fees and costs incurred in the preparation and filing of the QDRO's shall be borne solely by the husband.
 D. Spenser Trask 401(k) Plan: The husband shall be entitled to retain this asset free and clear of any claims by the wife.
 E. Chase IRA: The wife shall be entitled to retain this asset free and clear of any claims by the husband.
 9. The husband shall maintain and pay for health CT Page 435 insurance for each of the minor children so long as he shall be obligated to pay child support for that child. Unreimbursed medical, dental, orthodontic, optical, pharmaceutical, psychiatric, and psychological expenses for the minor children, shall be divided by the parties, 75% by the husband and 25% by the wife. The provisions of Section 46b-84
(e) C.G.S. shall apply.
 10. The husband shall promptly notify his employer as to the change of marital status and shall cooperate with the wife in obtaining continuation health insurance coverage as provided by state and federal law. The wife shall be responsible for the payment of any premiums due for such coverage.
 11. The husband shall maintain the existing Northwestern Mutual life insurance policy in the amount of $1,000,000, and shall name the wife and children as equal beneficiaries thereof for so long as he has an obligation to pay alimony or child support under the terms of this decree. He shall take prompt steps to pay off any existing loans against the policy, and for so long as he has an obligation to maintain same, he shall not borrow against the policy. He shall be entitled to keep the cash value, if any, free and clear of any claims by the wife.
 12. Commencing with the tax year 2001 and thereafter, unless they shall otherwise agree, the husband shall be entitled to the tax exemption for the minor child WYATT, and the wife shall be entitled to the exemption for the minor children JORDAN and COLLIN. Each shall promptly execute the necessary documentation and deliver same in a timely manner to the other for filing with the IRS and/or state taxing authority on an annual basis.
 13. Except as otherwise set forth herein, the parties shall each be responsible for the debts (including their credit card liabilities) as shown on their respective financial affidavits, and they shall indemnify and hold each other harmless from any further liability thereon. The foregoing notwithstanding, the husband shall pay in full the CT Page 436 outstanding balance of the existing home equity line within thirty (30) days from the date of this Memorandum of Decision and shall hold the wife harmless from any further liability thereunder. Thereafter, unless they shall otherwise agree, neither party shall use the home equity line or otherwise further encumber the real property ay 14 Broad Road, Greenwich.
 14. The Court finds that each party has sufficient liquid assets and each party shall be responsible for their respective attorneys fees and costs incurred in connection with this action. Maguire v. Maguire, 222 Conn. 32 (1992)
 15. The Court hereby orders an Immediate Wage Withholding Order pursuant to Section 52-362
C.G.S. in order to secure the payment of the alimony and child support orders.
THE COURT
SHAY, J.
FA 99-017402 S SYBIL HILL v. AUGUST 8, 2001 JOSEPH HILL
PARENT PLAN FOR JORDAN, COLIN AND WYATT HILL
1. Both parents realize that it is in the children's best interest that there be free and unhampered contact between the children and both of their parents. Each parent shall refrain from doing anything to estrange the children from the other parent or to disparage the opinion of the children as to the other parent. Neither parent shall do anything which may hamper the free and natural development of the children's love and respect for the other parent. Neither parent shall allow the children to communicate issues or information from one parent to the other.
2. The father and mother shall work together to provide a sound moral, social, economic and educational environment for the children and they shall be equally responsible for the care, emotional support and raising of said children.
3. Both parents recognize it is in the best interest of the children for CT Page 437 them to spend reasonable, frequent and liberal amounts of time with each of them. Although the parenting plan that follows will establish a regular schedule, that schedule may be altered and used flexibly only by mutual consent of both parents. The children may not in any way alter the schedule, and each and every plan made for them or by them must first receive permission from the parent the children are scheduled to be with at the time of the event.
4. Weekday schedule — school year
 [a] On weeks that the children are scheduled to be with their father on the coming weekend they will also be with him on that Tuesday night until he brings them to school on Wednesday morning.
 [b] On weeks that the children are scheduled to be with their mother on the coming weekend they will be with their father on Thursday evening until he brings them to school on Friday morning.
 [c] On Thursday evenings in weeks described above as (a) the children may have dinner with their father and be brought to their mother by 7 pm. Also on Tuesday evenings as described above as (b] the children may have dinner with their father until 7 pm. Any child may, however, decline the invitation to spend this time on Tuesdays or Thursdays. The child's desire to spend or not spend this dinner period will be respected and no undue pressure will be applied by either parent.
5. Weekend schedule — school year
 [a] The parents will be with the children on alternate weekends from after their last activity on Friday until school begins on Monday morning.
 [b] On school and legal holidays that occur on Mondays, including Memorial Day and Labor Day the parent scheduled to have the children for that weekend will have them until Tuesday morning.
 [c] On school holidays that occur on Fridays the parent scheduled to have the children for that following weekend will have them from Thursday after their last activity until Monday morning. This does not pertain to the four-day regular winter private school recess.
6. Vacations — school year
The parents will alternate having the children during the major school vacations. In the private schools those vacations are: Thanksgiving of 4 CT Page 438 to 5 days, Christmas of 10 days to two weeks, winter break of four days and spring break of two weeks.
 [a] Each year the parents will each have the children one short and one long recess. Starting in the school year 2001-2002, for example, the children will be with one parent on Thanksgiving and the following spring break of two weeks. They will be with the other parent during the Christmas vacation and on the four-day winter break. The exception to the above is that both parents may spend some time with the children on Christmas day. To facilitate this, the children will be with one parent from the beginning of the Christmas recess including Christmas Eve, until 11 am on the morning of Christmas Day. The other parent will then be with the children from that time until the end of the Christmas recess. This holiday schedule will alternate between parents from year to year. At the end of a vacation the children will be brought to the mother's home no later than 6 pm on the day prior to the beginning of school.
7. Summer
 [a] Until the year 2004 each parent may take the children away for a period up to two consecutive weeks. One parent may do the two week period at the earlier part of the summer while the other parent may do the same toward the end of the summer. This schedule for each summer should be decided no later than April 30th of each year. If any of the children attend sleep-away camp the parent's arrangement of this two weeks need be altered to not interfere with the camp schedule. After the 2004-2005 school year each parent may take the children away for a period of up to three consecutive weeks.
 [b] When the children are not away for two weeks or three weeks with either parent, they will spend alternate weeks with each parent. The first week will be from Sunday evening at 6 pm until the following Sunday at the same time. The following week will be with the other parent and so on for the remainder of the summer. During this period of time the parent who is not with the children may spend time with them on Wednesday evenings from after day camp or their last activity until 8 pm that evening. If and when a parent exercises their opportunity to have the children for their exclusive two or three-week summer vacation but does not leave the home area (i.e. Greenwich) the Wednesday evening visit with the other parent will take place.
[c] This schedule is also dependent upon the availability of the parent CT Page 439 the children are scheduled to be with. It for example, one of the children is not in day camp or in an all day activity and the parent is not available, the child will spend the day with the parent who is available and the child shall be returned to the scheduled parent when he or she becomes available.
 [d] The longer vacations such as Christmas, spring recess or summer are to be considered of higher priority than the shorter holidays such as mother's or father's birthdays, July 4 or the children's birthdays. Therefore, for example, if the children are to be away on a two week scheduled trip during the summertime they do not have to return in the middle of the trip for a one-day holiday or birthday.
8. Special Events
 [a] On their birthdays, the children will share the day by spending equal time with each parent.
 [b] The children will be with their mother on her birthday and on Mother's Day. Likewise, the children will be with their father on his birthday and on Father's Day.
 [c] July 4th will alternate from year to year. The two consecutive weeks vacation will take precedent over July 4th.
9. COMMUNICATION
 [a] The functioning of this schedule is fully dependent upon the availability of the parent the children are scheduled to be with. If a parent is not available [e.g. business, social commitments, etc.) for a period of six hours or longer, the children will then be with the other parent. The parent who is not scheduled to be with the children has the "right of first refusal" as to being with the children rather than a caretaker, step-parent, etc. It is the responsibility of the parent with whom the children are scheduled to be with to inform the other parent if they are going to be unavailable for a period of six hours or longer (this six hour period does not include their normal evening sleeping hours). They are to inform the other parent as soon as they know they can not be available.
 [b] Each of the parents agrees to keep the other informed as to the children's general whereabouts while with the father or mother, including the telephone number. Each parent further agrees that if either has the knowledge of any illness or an accident or other CT Page 440 circumstances seriously affecting the health or welfare of the children, the father or mother, as the case may be, will promptly notify the other.
 [c] The father and mother may communicate with the children by telephone or letter, within reason, at any time and during reasonable hours while the children are with the other parent.
10. DECISIONS
 [a] The mother and father shall have joint decision making powers regarding the children. Any and all major decisions affecting the education, religious upbringing and elective medical needs of the children shall be made with equal participation and involvement of both parents.
 [b] In the event that the parents cannot agree on such matters, they shall resolve their dispute through referring the matter to mediation. If they still are unable to resolve the dispute, the dispute shall go to binding arbitration. If the dispute involves psychological issues, Dr Brodlie or a licensed psychologist mutually agreed upon by both parents will be hired to mediate and/or arbitrate the matter if the dispute involves elective medical issues, the children's regular pediatrician will function in that capacity. If the child's doctor is not available for such a role, Dr Brodlie or any other person agreed to by both parents will choose a person to function as a mediator/arbitrator. Upon any significant change in circumstances of either parent (e.g. moving, remarriage, disability, etc.) the parenting plan shall be revisited and appropriate changes made.
 [c] The parents further agree that the children may not convert to a different religion without the mutual consent of both parties.
 [d] These custody provisions shall not be affected by either parent's remarriage.
 [e] Neither parent will permit the children to refer to other persons as father, mother, dad, mom or otherwise.
 [f] In the event of the death of a parent, full and unconditional custody shall revert to the living parent. The living parent shall have full rights to determine the children's custody on the event of the death of the other parent. The living parent shall provide reasonable visitation rights of the children to the deceased parent's own parents, sisters and brothers.
CT Page 441
 [g] Any of the children may have access to Dr Brodlie or another Child Psychologist mutually agreed upon by both parents for one or two visits. This is for the purpose of receiving comments on any undue pressures being applied to them by a parent. Any ongoing be agreed upon by both parents.
 DR. JEROME F. BRODLIE 17 SHERWOOD PLACE GREENWICH, CONN. 06830 ___ Telephone 203-869-2823
24 July 2001
Mr. Joe Hill
14 Broad Street Greenwich, CT 06830
Dear Joe,
This is in response to your request to clarify, explain and expand on two points of the Parenting Plan.
Firstly, I did not put anything into the plan regarding relocation as I was assuming the attorneys would address that issue. In any case, my recommendation is that if either parent plans to relocate more than forty-five miles from Greenwich, that they inform the other parent at least 90 days prior to their intended move.
Secondly, as relates to the vacation schedule. If the school Christmas recess begins more than 5 full days prior to December 25th the Christmas recess will be divided exactly in half. One parent having the children the first half and the other parent the second half. In that case the spring recess will also be divided in half. If Christmas is split equally, the parent not with the children on Christmas day may visit with them wherever they may be. If the school recess begins less than 5 days prior to Christmas day the schedule as described in the original agreement will be in effect.
These recommendations may be considered part of the original Parenting Plan.
Very truly yours,
Jerome F. Brodlie, Ph.D. CT Page 442 Jfb/dg